NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (4th) 251141-U

NO. 4-25-1141

IN THE APPELLATE COURT

FILED
July 7, 2026
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| MATTHEW D. KRAPFL, | ) | Appeal from the |
| Petitioner-Appellant, | ) | Circuit Court of |
| v. | ) | Rock Island County |
| STACEY J. KRAPFL, | ) | No. 25OP229 |
| Respondent-Appellee. | ) | |
| | ) | Honorable |
| | ) | John L. McGehee, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Justices Doherty and Lannerd concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The appellate court affirmed the trial court's decision to deny issuance of a plenary order of protection.

¶ 2     Petitioner, Matthew D. Krapfl, appeals the trial court's denial of his petition seeking a plenary order of protection against respondent, Stacey J. Krapfl, for himself and four minor children, two of whom are not his biological children. Upon denying the plenary order of protection, the court *sua sponte* opened a guardianship case and appointed Matthew as standby guardian of Stacey's two oldest children, who are not his biological children. Further, during the pendency of this appeal, Stacey filed a motion to strike new argument in Matthew's reply brief and leave to amend citations and the appendix in her brief, which was taken with the case. We deny the motion taken with the case, and we affirm the denial of the plenary order of protection.

¶ 3     I. BACKGROUND

¶ 4    Matthew and Stacey met in 2016 when they both lived in the state of Washington. They later moved to Illinois, purchasing a house in Moline in November 2022. They were married in March 2023. The parties have two children together, M.K. (born June 2022) and C.K. (born August 2023). Stacey also has two children from a prior marriage, K.R. (daughter born August 2011) and J.R. (son born November 2012). Stacey is the custodial parent of K.R. and J.R. and was granted primary decision-making responsibility for them.

¶ 5    In March 2024, Matthew filed a *pro se* petition for an order of protection, seeking emergency and plenary protection from Stacey for himself and the four minor children. Around this time, Matthew also filed a petition for dissolution of marriage (Rock Island County case No. 24-DC-57). The trial court granted the emergency order of protection and extended it numerous times in proceedings before Judge Jeffrey S. McKinley. Those proceedings are described in our prior decision in *Krapfl v. Krapfl,* 2025 IL App (4th) 241514-U, where we affirmed the trial court's decision to extend the emergency order of protection. Therefore, we will not restate those details here and will begin discussion of this case with the proceedings leading up to and including the hearing on the plenary order of protection which is the subject of this appeal. We note that Stacey was previously represented by counsel in the order of protection case but has appeared *pro se* since November 2024, when she filed a motion seeking to proceed *pro se*. The record indicates Stacey is represented by counsel, Doug Scovil, in the dissolution proceedings. Attorney Scovil has not filed an appearance or otherwise represented Stacey in the order-of-protection proceedings.

¶ 6         A. Proceedings After the Initial Appellate Court Decision

¶ 7    In April 2025, Stacey filed a motion seeking substitution of judge for cause, contending Judge McKinley engaged in improper *ex parte* communications and exhibited

-2-

prejudice against her in the order of protection case. According to a docket entry dated May 12, 2025, a hearing was held and Stacey's motion was denied because she "conclusively failed to show bias or prejudice." The case was continued to June 6, 2025, for a hearing on the plenary order of protection. In the interim, numerous additional motions and responses were filed by the parties. A docket entry dated June 3, 2025, indicated Judge McKinley recused himself, and the case was continued for the appointment of a new judge. On June 11, 2026, Judge John L. McGehee was assigned to the case.

¶ 8        A docket entry dated July 8, 2025, stated the dissolution case and this order-of-protection case had been "consolidated" and listed as many as eight pending motions. However, the record shows the cases were handled separately, though at times simultaneously, thereafter. Stacey's counsel, representing her in the dissolution case, did not appear at any of the order-of-protection court dates.

¶ 9        On September 3, 2025, the parties appeared before Judge McGehee for a hearing on the plenary order of protection. Matthew's counsel informed the trial court that he had requested a full-day hearing, but the court scheduled the matter for only half a day. Noting that Stacey's counsel in the dissolution case was not present, the following colloquy occurred:

"THE COURT: Okay. So we're going to really kind of bifurcate out.

The Court is not going to review and the Court has not reviewed any of the previous testimony from other cases—or the other hearings that have gone on with Judge McKinley. So—

* * *

MR. SINGER [(MATTHEW'S COUNSEL)]: Sorry, Your Honor.

Then I need to move for a continuance. When we were here last time, you

said you—you were going to order the transcripts and review everything because I specifically asked the Court if you intended to start fresh or base it upon the testimony of the previous three days.

THE COURT: We didn't get an agreement from that, though, did we? I thought that this is—

MR. SINGER: I thought there was an agreement, Your Honor.

THE COURT: Okay. So the issue, then, is—ma'am, are you agreeing to have me go back and review all of the testimony?

Because what I'm going to do today is I'm bifurcating out the—the temporaries in the DC case and the OP case because your attorney, Doug Scovil, is not a part of this OP case. He's—only the DC case. And so I am just going to be determining issues in the OP. I'm kind of breaking those two out and all because—because of how your attorney has proceeded to filing an appearance only in the DC case, even though they've been consolidated. They were consolidated by court order. But the issue still remains that we're only dealing with the OP part of this.

Now, if I were to go back and to read all of the transcripts of everything from the previous time, then I would pick out what I think is relevant to the OP and then pick out what I think is relevant to the temporaries. But I'm not sure that we've got an agreement as it relates to that.

[STACEY]: May I speak?

THE COURT: Yes.

[STACEY]: *** I don't agree. I think this has gone on long enough. The

transcripts would contain a whole bunch of things that only had to do with temporaries because the cases were consolidated at that time and wouldn't really be relevant to the OP. It's supposed to be an expedited proceeding. The issues at question, only Matt and I were there. There really should be no need to call a ton of witnesses or anything like that.

THE COURT: Okay. Okay.

[STACEY]: And I would like to get this done today.

THE COURT: Okay. Yeah. On the OP.

Now, *** you want to make a[n] oral motion to continue it and for me to go through all of those transcripts; is that right?

MR. SINGER: Or I can recall the police officer and the witnesses that are relevant. Obviously, there's some witnesses from the previous days' hearings that would not be relevant to the OP, and I wouldn't recall them for the purpose of that.

THE COURT: Okay.

MR. SINGER: But based upon the discussion we had last time we were here and the reason that I only thought we needed a half day, it was my understanding the Court was going to review the transcripts and then [Stacey] would—we'd pick up where we left off, which would be her cross-examining my client; me doing any redirect [examination] based upon her cross; and then we would rest and it would be her turn to put on the remainder of her case because she did already call two witnesses—well, three witnesses prior.

THE COURT: Well, *** the way I remember it is that there were so many

-5-

motions pending, there were so many things. I was just a new judge to the case, and I know there were some discussions because you've wanted the transcripts; you've asked for the transcripts, but it was more on the issue of an appeal is my understanding versus transcripts as it relates to the OP. Is that right?

[STACEY]: That's correct. And a lot of the transcripts that exist now—I mean, they're very sporadic and incomplete so there's not even that much for you to review even if you were to go review them.

THE COURT: Okay. Okay. Well, *** what's going to have to happen is, is that if there is no agreement on the review of transcripts, then because of everything that's gone on with Judge McKinley recusing himself and then me getting put into this case—and if there is something from the previous hearings, then we're going to have to start over.

MR. SINGER: And that was the issue that I asked the Court to address *** when we were last here.

THE COURT: Did *** I rule?

MR. SINGER: You didn't.

THE COURT: I thought I just took it under advisement.

MR. SINGER: Correct. But you also said—its' my recollection, Judge, that you said you were going to order and go through all of the transcripts because I was very clear about wanting to know whether we were going to based it on what had already happened or whether we were starting fresh—

THE COURT: Okay."

¶ 10      The discussion continued, with Matthew's attorney stating he had the impression

the trial court was going to go back and read everything as part of the hearing. The court indicated there was no agreement to include the prior transcripts in this hearing, so he concluded they would get through "as much as we can today." Matthew's attorney indicated he was not prepared to do that. The court concluded further, "We're going to start from scratch." The matter was continued for a one-day hearing on September 23, 2025.

¶ 11          Later that day, Matthew filed a motion asking the trial court to allow reading of previous testimony that was heard by Judge McKinley on three previous hearing dates. Stacey filed an objection. In a docket entry from September 9, 2025, the court reserved the issue of reading the transcripts from past hearings regarding the final determination of the plenary order of protection.

¶ 12                              B. Plenary Order of Protection Hearing

¶ 13          On September 23, 2025, the hearing was held on the plenary order of protection.

¶ 14                              1. *Matthew's Evidence*

¶ 15          Kathy Krapfl, Matthew's mother, testified Matthew informed her in mid-February 2024 he thought Stacey may be starting to have "problems." Kathy explained Stacey's problems were that she was having "some religious-type ideas" and talking about "heaven and hell" and did not seem to be herself. Kathy testified this was not the first time Stacey exhibited this type of behavior. As a result, she and her husband went to Matthew and Stacey's home and stayed with them "most frequently during the week to assist with household chores, running kids." Kathy was in their home on March 6, 2024, when the incident leading to Stacey's arrest occurred. Kathy explained Stacey had been "committed" to Trinity Rock Island Hospital in February, she stayed there for about two weeks, and when she returned home in the afternoon on March 5, 2024, she was "combative, arguing, loud." Kathy said when Stacey walked in the house, she

argued with Matthew and she was also yelling obscenities at her and her husband and telling them to leave. Early the next morning, the police were called, and Stacey was arrested. Kathy did not witness the altercation between Stacey and Matthew, but she heard it from the basement. She heard Stacey yelling at Matthew to "let her alone, to get out of her house." Kathy went upstairs after the police had arrived.

¶ 16　　　　Kathy recalled an incident that occurred in 2018, which was before the two youngest children were born. Stacey and Matthew were living in Washington at the time, and Stacey "took off" with her two children without telling anyone and drove to Chicago. Kathy said Stacey was panhandling on the streets of Chicago with the two children. Kathy picked up the children at a hospital in Chicago, and they stayed with her and her husband for two or three days until their grandmother arrived. Kathy testified that she traveled to visit Stacey and Matthew in Washington in 2020, and Stacey was hospitalized for a weekend for mental health issues during that visit.

¶ 17　　　　On cross-examination, Kathy acknowledged she visited Stacey and Matthew's home in Moline twice a month. She testified Matthew had called and asked her to come help with the children around February 15, 2024, because he was concerned with Stacey's behavior. He asked her to "keep an eye out" for behaviors that might endanger the children, and there was concern Stacey would "take the children from the home." When Stacey returned from her stay in the hospital, Kathy acknowledged she wanted to limit Stacey's interaction with the children. Kathy stated, while Stacey was in the hospital, she and her husband stayed in a bedroom in the basement that belonged to Stacey's son. She conceded the son was sleeping on the floor, but they had "cots there and beds made up with plenty of blankets," and the floor was carpeted in the finished basement. Kathy stated when Stacey came home, she told them they needed to leave the

bedroom and said, "I don't care if you sleep outside." Kathy acknowledged in 2020, after their retirement, she and her husband sold their home, purchased a recreational vehicle (RV), and intended to travel. They also stayed in their RV at Stacey and Matthew's home for three months, but they had permission to do so. Kathy also stated, when Stacey and Matthew moved to Illinois, they stayed in Kathy's apartment for several months until they moved to Moline.

¶ 18          Matthew's counsel indicated one of his witnesses, Officer Darren Southwell, failed to appear at the hearing, despite being subpoenaed at the Moline Police Department. After contacting the police department, Matthew's counsel learned Officer Southwell was out of town on tactical training. Officer Southwell testified at a previous hearing, and a discussion was had regarding whether the trial court could review a transcript of his prior testimony or listen to it if no transcript had been prepared. When asked if she agreed, Stacey stated she wanted to "avoid a continuance at all costs" but noted her concerns that the report Officer Southwell would refer to had been "expunged," and if Officer Southwell would testify, "it would look a lot different than it did on that day." The court took the matter under advisement. However, after further discussion, Stacey reiterated she would "make an agreement" that did not result in a continuance so the hearing could be completed that day. The court responded, "Very good. Okay. Thank you. So *** I'm going to be probably listening to it."

¶ 19          Stacey was called to testify as an adverse witness. She testified she had an associate's degree and currently worked two jobs, as a server at a restaurant and a "temp" position as an executive legal assistant. She acknowledged on February 17, 2024, she was hospitalized for two weeks for mental health issues, which was precipitated by a welfare check call from one of her neighbors. She returned home on March 5, 2024, and was arrested because Matthew told the police she punched him. Stacey denied punching Matthew. She admitted two of

her friends, Lisa Walden and Gail Riggins, testified in a prior hearing that she told them she "put a dishrag in Matt's face and swiped it across his face." Stacey testified she had been hospitalized for mental health issues four times between 2018 and 2024. Two of those incidents were in 2024. The first was for two weeks in February, and the second was in March, when she was transferred from the Rock Island County jail to a hospital because she refused to eat. Stacey acknowledged she put the cleaning rag with Dawn a cleaning product on it on Matthew's face and said she was sorry about it, and she said she would "definitely" never do it again.

¶ 20        Matthew testified he had a master's degree in business and currently worked as a family advocate for a daycare center. In February 2024, Stacey told him she felt as if "something wasn't right," and it escalated within a few days, to the point that she was making "nonsensical statements and being aggressive." As examples, he recalled Stacey called a neighbor who came to their door a "whore of Babylon" and made other incoherent statements to the neighbor, she accused Matthew of being different people, and she talked about the president or the actor Dana Carvey being God. Stacey was not sleeping during this time, and she would clean "nonstop" and was "pacing and being angry." Matthew recalled she would challenge people to hit her and she tried to spit on his father. The police made a well-person check, prompted by a call from a neighbor, after which Stacey was taken to Trinity Rock Island Hospital. Matthew visited Stacey when she was initially hospitalized in the emergency department but did not visit during the rest of her stay.

¶ 21        Matthew testified on March 5, 2024, Stacey just showed up at home in the afternoon, was very angry, and told him and his parents to get out of the house. Stacey, who had been breastfeeding their infant, was very upset the baby had been drinking formula. She dumped out the baby's formula and "swiped" at Matthew to knock the bottle away from the baby. He

testified Stacey was yelling, "F you," aggressively in front of the children. Matthew testified, when it was time for bed, his parents went to the basement bedroom, the children went to their rooms, he told Stacey to sleep on the couch, and he took the baby to sleep in his room. Stacey was "making a lot of racket during the night." Matthew had to sneak downstairs at 2 a.m. to make a bottle for the baby. At 5 a.m., he heard more noise downstairs. He went to the kitchen and saw Stacey was "very awake" and cleaning. She had thrown a lot of things in the garbage, including things that belonged to the children. Matthew told her to calm down, but she got very angry. He stated Stacey got "right up in [his] face," and when he did not back down, she hit him in the chest, specifically referring to his left pectoralis right under his collar bone, with a closed fist. Matthew told Stacey she needed to stop, and she yelled at him again and rubbed the rag or paper towel she had in her hand in his face. Matthew called the police, and Stacey was arrested for domestic violence. Later, the state's attorney called to inform Matthew the charges were being dropped.

¶ 22      Matthew testified, in 2022, when they lived in Washington, Stacey exhibited similar behavior. At that time, she threw rocks at him, and one broke a window in the house near where the children were sitting. Matthew admitted he was seeking a plenary order of protection for "[as] long as possible" for himself and the four children. He believed he should have continued possession of the marital home and "physical possession" of all four children. He thought Stacey's supervised visitation should continue under the current plan, with her seeing the children on Tuesdays and Thursdays from 5 p.m. to 7:30 p.m. and on Sundays from 9 a.m. to 5 p.m. Matthrew stated, when a supervisor is not available on Sundays, Stacey visits the children "remotely" via Facebook messenger. He observed that during that period, the children primarily engaged in playing video games, and he felt this behavior should not be permitted.

¶ 23　　　　　On cross-examination, Matthew admitted he wanted the order of protection for as long as possible because he was concerned with Stacey's erratic behavior and concerned she may show up where he works and try to cause trouble for him, make false accusations against him, or try to take the children somewhere. Matthew explained Stacey's aggressive behavior and "hitting" is "scary behavior" and he does not know when it is going to happen.

¶ 24　　　　　2. *Objection to Dr. Adnan Safvi's Testimony and Preliminary Ruling*
*on the Plenary Order of Protection*

¶ 25　　　　　The trial court decided to take a lunch break to give "everybody a moment." The court noted Stacey had a witness scheduled to testify via Zoom at 1 p.m. Dr. Adnan Safvi (whose name is misspelled throughout the transcripts) was Stacey's doctor when she was hospitalized in March 2024. The court determined Dr. Safvi could testify out of order due to scheduling. Matthew's counsel objected, arguing Matthew should be allowed to finish his cross-examination testimony "so that it all links up." The court overruled his objection. Matthew's attorney made another oral objection to Dr. Safvi being allowed to testify because he had never been disclosed in previous discovery disclosures. Stacey interjected that she had disclosed Dr. Safvi as a witness in an e-mail. Judge McGehee stated, "The Court wants to hear the doctor, so the doctor is going to testify." The following discussion occurred:

　　　　　"THE COURT: Okay. If you're going to be making those objections, that's fine. You can make it for the record, but I am terminating the order of protection. If you don't want to hear the doctor, that's fine. The order of protection is going to be terminated.

　　　　　And so what that means is that—but I am going to appoint a standby guardian as you're the standby—

Please sir, don't give me the faces that you're giving me right now.

[MATTHEW]: *** I'm sorry.

THE COURT: Okay?

This is a very contentious matter, *** and I don't believe that —you've had *** an order of protection for a year and a half already. It's a year and a half that order—an order of protection regarding this particular matter.

She has mental health issues. Clearly, that's the case. But the issue of protection on an order of protection—you've had it. It's settled the issues down. That's what the Court had heard.

So what the Court's going to do is the Court is—if—I want to hear the doctor testify, Mr. Singer.

And so I'm going to—on my own motion, I'm going to have the doctor testify because I want to hear—

MR. SINGER: Okay.

THE COURT: —about her mental health.

MR. SINGER: I'm—

THE COURT: So I'm going to have the doctor testify. ***"

¶ 26    The court stated further,

"So what we're going to do is that we're going to hear the doctor testify at 1:00 o'clock, but I'm going to be terminating the order of protection.

What I'm going to be doing—because I want to give everybody notice— *** is that you're going to be getting—I'm going to go back to the other case.

You're getting custody of all four kids, sir.

-13-

Okay?

What you're doing is you're going to be appointed as a standby guardian on the two kids that are not biologically yours; they're hers. Okay?

But you're going to be *** appointed as the standby guardian, and we're going to go back to the family case, and we're going to try this case in the family case. But what I want to do is—I want to hear the doctor testify what kind of visitation and what kind of parental time the mother's going to get with these four kids. That's what I want to hear this afternoon.

So that's what we have to move—we're not going to be—the order of protection is going to be over. It's done."

¶ 27 Matthew's counsel objected and asked for further explanation of the trial court's decision. The court acknowledged there was a "mental health issue breakdown" but explained this was "clearly not one of those kind of cases for an order of protection." The court explained further:

"You're making this an order of protection case and a custody case. That's what you're doing. That's not what the statute is. Every judge, every appellate court says that is not the purpose of an order of protection hearing, and you're doing that, and it's been going on for long enough. A year and a half is long enough. You only get two years anyway. Okay?"

¶ 28 Matthew's counsel continued to object to the proceedings and stated, if they were going back to the dissolution case in the afternoon, Stacey's attorney of record was not present, it was not noticed up for hearing, and he had no opportunity to prepare for that. The court

overruled the objection, and the court ordered everyone to be back at 1 p.m. for Dr. Safvi's testimony.

¶ 29    3. *The Trial Court's Clarification of the Preliminary Ruling on*

      *the Plenary Order of Protection and Continuation of the Proceedings*

¶ 30    Upon reconvening, the trial court clarified, although it had indicated it was going to terminate the order of protection, it had not done so yet. The court would allow Matthew's counsel to present more evidence to support his contention the order of protection should remain in place. The court stated further:

> "Now, you've indicated that Mr. Scovil is not here to be a part of this and all, but if the Court just terminates the order of protection, then there is—it goes back to whatever orders there were, and for one, your client does not have custody of the other two kids. He's not the biological father of the other two kids, so really he has nothing. Okay? And so there's been no guardianship filed, nothing been filed for the benefit of those kids. You've all been depending on the OP. Okay?
>
> So what we're proceeding on is everything. We're proceeding on the OP, we're proceeding on the DC case, and we're proceeding on a possible guardianship case. We're proceeding on all of them. So that's where—and I want to hear evidence. So the Court will make a determination on what the Court is going to do. So everything is open at this point. That's what we're proceeding on."

¶ 31    Matthew's attorney renewed his objection to Dr. Safvi's testimony because his opinion was not disclosed. Stacey responded that she e-mailed Matthew's attorney several

months ago to let him know that Dr. Safvi would testify regarding her stay in the hospital. The court allowed the witness to testify over objection.

¶ 32    Stacey inquired of the trial court, stating she was "nervous" because she has an attorney in the dissolution case, if this was a "temporary hearing." The court asked her, "[D]o you want to present evidence in the OP case as it relates to this witness?" and she responded affirmatively. The court then said an order had not been signed terminating the order of protection yet and he wanted to hear from this witness. He reiterated, "So this is on all cases," and again said, "[T]hese are on all pending cases now, OP, the DC case, as well as a possible guardianship case." Stacey inquired again, commenting that she did not know anything about a guardianship case. The court responded, "I know. The Court can do it on its own motion." The court explained it had the authority to appoint Matthew as a standby guardian without notice to anybody because it had to protect the children. The court asked again if Stacey was ready to present the witness, and she replied, "I would love for this witness to be heard, but as far as, like, his testimony as it relates to, ***what's needed 'evidentiarily' for a DC case proceeding or even a guardianship proceeding, I don't know the first thing about a guardianship proceeding." The trial court responded,

> "Okay. Well, the Court thinks that this witness would be helpful to the
> Court. So the Court will ask questions. If you don't ask questions, the Court is
> going to ask questions, and Mr. Singer is going to ask questions, and he is going
> to be able to either cross-examine or ask questions of this witness. So the question
> is do you want to ask questions of this witness? Or do you want the Court to ask
> questions as—I cannot be your lawyer. All I can do is be the Court's evidence on
> what's in the best interest of the children. Okay. So that's now up to you.

-16-

See, this is what happens when you represent yourself, ma'am. Okay? This is how trials go. And this is where we're at at this point based on the testimony from this morning. Okay?"

¶ 33                    4. *Testimony of Dr. Safvi*

¶ 34        Dr. Safvi, a physician specializing in psychiatry, testified he worked at Streamwood Behavioral Hospital and treated Stacey from March 13 to 21, 2024. She was admitted due to concerns of paranoia and her refusal to eat or drink for several days while in jail. At that time, he diagnosed Stacey with "adjustment disorder with mixed disturbance of conduct and emotions." He explained, "[S]ometimes a patient can go through some sort of level of trauma or some sort of incident that can trigger a variety of emotions. So emotions being depressive symptoms, anxiety symptoms, irritability, and sometimes even conduct symptoms such as aggression." Dr. Safvi testified Stacey did not want to be on any medications and she was not prescribed any upon being discharged. On cross-examination, Dr. Safvi testified he recommended Stacey take medication to help her mood symptoms, but she refused medication. She did not meet the criteria for "involuntary medications," and it was her right to refuse them, though he believed medications would have been helpful to her. Dr. Safvi knew Stacey had been hospitalized in February 2024, but he did not know the reason for that hospitalization. Dr. Safvi stated her diagnosis could result in paranoid behavior, but he did not see her exhibit any symptoms consistent with psychosis or paranoia. Dr. Safvi testified his treatment was focused on short-term treatment and stabilizing a patient to facilitate discharge. He said it would not be appropriate to have an opinion on her long-term prognosis for future risk factors.

¶ 35        On redirect examination, Dr. Safvi testified Stacey's symptoms improved without medication during her hospitalization. He acknowledged adjustment disorder involves an

incident, possibly a traumatic experience, that instigates the symptoms. Therefore, he agreed it was possible for a patient to be cognizant of the environmental factors and take steps to mitigate or control them to avoid symptoms. Dr. Safvi acknowledged Stacey did well in the facility with trained staff and a controlled environment, but their facility was not for long-term care. Dr. Safvi was aware Stacey had given birth five months before her admission and agreed being postpartum could have been a trigger for her condition.

¶ 36　　　Matthrew's attorney stated he had nothing further to present, other than the issue of the police officer's prior testimony, which the trial court indicated it would try to listen to later in the afternoon.

¶ 37　　　　　*5. Trial Court's Sua Sponte Opening of a Guardianship Case*

¶ 38　　　Stacey asked if she would be allowed to present any evidence, and the trial court told her she had a right to do so, but the court was not sure she needed to. The court stated "This is not a custody hearing. This is not a hearing to determine really an issue of visitation or anything like that. Okay? But the Court can on its own motion do what's in the best interest of the children."

¶ 39　　　At that time, Judge McGehee asked his clerk to "open up a guardianship case." The trial court then appointed Matthew as the standby guardian for Stacey's two older children. Stacey asked the court to explain, and further discussion was had on the issue. The court explained this was "only short term" and told Stacey, "The order of protection is done. That's what you wanted." Stacey replied, "It doesn't matter if I still don't get my kids. I don't understand—." The court explained it was terminating the order of protection, and it now wanted "to hear some testimony as it relates to what's in your best interest of when you see your kids. Okay?" The discussion continued:

"[STACEY]: Your Honor, I don't understand. I have *** custody of the children from a divorce decree in another state. I don't understand what I've done wrong to override that custody degree—decree.

THE COURT: Well, there are very—we have to do this step by step, ma'am. This is a case that is very, very difficult for me, for you, for him, for Mr. Singer. *** I'm going to set this for a status, and get your attorney in here and file a motion to terminate the guardianship and have a hearing on that. And so I have to take this step by step. So we need to get Mr. Scovil in here.

So I'm going to set a status for a very short period of time to get Mr. Scovil to appear on the status and set this down for a hearing."

¶ 40    6. *Recommencement of the Hearing on the Plenary Order of Protection*

¶ 41    Stacey called Gail to testify. She testified she is retired, having worked for the Rock Island Housing Authority for 23 years as a liaison and caseworker. She met Stacey in an art class in late 2022. They reconnected when they were both in another art class in March 2024. She learned Stacey was in the middle of a domestic dispute and needed a place to stay, so she and Lisa, another mutual friend, allowed Stacey to live with them for periods of time. She knew Stacey had been a stay-at-home mother and did not have a job or a lot of work experience. Gail testified that she used her experience as a housing authority caseworker to help Stacey find a job. Gail agreed to go through the process of becoming a visitation supervisor so she could help Stacey. In the beginning, Gail supervised all the visits, which consisted of 13 hours per week. Later, Lisa became a visitation supervisor, and they divided the responsibility. Gail described the interactions between Stacey and the children during the visits as happy and affectionate. Gail testified Stacey lived with her for over a year and she never saw any indications of abusive

behavior, and, in fact, she saw "a loving mother and children who loved their mother." Gail said Stacey had a job within a month of moving in and often worked extra hours and was seeing a counselor. She was "extraordinarily responsible" and "put forth a good deal of effort trying to put [her] life back together again." When asked if she was ever afraid of Stacey or saw any reason for the children to be afraid, she replied, "Absolutely not." She testified, during the 13 hours a week of visitation she supervised over numerous months, she observed Stacey being deliberate in her interactions with the children, reading to them, having conversations about school, and singing with them in the car. Gail stated Stacey "did not assume or take for granted the time [she] had with [her] children."

¶ 42        Lisa testified she met Stacey in an art class in 2023. She was also friends with Gail and became a visitation supervisor. She testified that over the last 18 or 19 months that she'd known Stacey, she saw Stacey "continually sacrifice for her children" and do some "very hard things." She explained Stacey had been in counseling, obtained some "medical help," changed her diet, and worked two different jobs. Stacey also became part of her church family. She testified Stacey's children "adore" her and they truly love one another. Lisa stated she would have no concern if the children were allowed to be alone with Stacey.

¶ 43        Matthew was recalled to testify as an adverse witness. Stacey inquired further regarding their relationship history, and notably, the status of their relationship in February 2024 and in 2022, when she had a prior mental health crisis. The trial court interjected numerous times to encourage Stacey to remain focused on the matter at hand, and finally, the court stated, "I've heard enough. I've heard enough. I have. Because this is agonizing to watch you question him about your relationship."

¶ 44                          7. *The Trial Court's Ruling*

¶ 45    After hearing the evidence, the trial court found a plenary order of protection was not necessary. The court further found the emergency order of protection terminated as of the date of the hearing. The court ordered Stacey's visitation with the children would be as scheduled but was no longer required to be supervised by anyone. Matthew's attorney requested a "mutual civil injunction that neither party will harm, stock [*sic*], harass, surveil, et cetera, the other, and that the parties only communicate regarding parenting time issues via Our Family Wizard," which was granted.

¶ 46    The trial court stated it had opened a guardianship case (Rock Island County case No. 25-GR-75) and had appointed Matthew as the standby guardian for K.R. and J.R. "for a short period of time, until the guardian *ad litem* can give me a report as it relates to what is in the best interest and do we divide these children up." The court stated Mr. Scovil would be contacted but also advised Stacey to call him and "let him know what happened here today."

¶ 47    This appeal followed.

¶ 48    In a motion taken with the case, Stacey asks this court to strike the new arguments in Matthew's reply brief and for leave to amend citations and the appendix in her brief. Matthew objected. This court denies the motion.

¶ 49                    II. ANALYSIS

¶ 50                    A. Denial of the Plenary Order of Protection

¶ 51    Matthew argues the trial court erred in denying his petition for a plenary order of protection. He contends (1) Stacey's actions constituted harassment or abuse under a liberal construction of the Illinois Domestic Violence Act of 1986 (Act) (750 ILCS 60/101 *et seq.* (West 2024)) and (2) the children should be protected from her "erratic and dangerous behavior." In support of his contentions, Matthew refers to testimony and evidence that was not presented at

the hearing before Judge McGehee. He instead assumes this court should consider testimony of witnesses presented at earlier hearings in this case, which involved consideration of not only the order of protection, but also the proceedings regarding temporary orders in the dissolution case. Those hearings were held June 18, 2024, October 31, 2024, and November 1, 2024, before Judge McKinley. However, after Judge McGehee was assigned to this case, he stated that the hearing on the plenary order of protection was "going to start from scratch." That hearing was finally held on September 23, 2025, after the emergency order of protection had remained in effect for over 18 months. Judge McGehee did not consider any of the evidence presented at hearings held before Judge McKinley, although the parties agreed he could review the testimony of Officer Southwell, who was called as a witness but failed to appear due to a scheduling conflict. The record reveals, however, that Judge McGehee did not review that testimony.

¶ 52        A trial judge has inherent authority to control his courtroom. *Gapinski v. Gujrati*, 2017 IL App (3d) 150502, ¶ 37. This includes the presentation of evidence. See Ill. R. Evid. 611(a) (eff. Oct. 15, 2015). On appeal, Matthew has not argued the trial court erred in declining to review the evidence presented at prior hearings to determine what may have been pertinent to the issues related to the plenary order of protection; thus, the matter is waived. See *Eberhardt v. Village of Tinley Park*, 2024 IL App (1st) 230139, ¶ 25. "It is a 'well-established principle of appellate review' that 'failure to argue an issue in the opening brief waives that issue on appeal.' " *Id.* (quoting *Fink v. Banks*, 2013 IL App (1st) 122177, ¶ 15). Under the circumstances, this court will not look beyond the record that served as the basis for Judge McGehee's decision in this case, which was the testimony presented at the hearing held on September 23, 2025.

¶ 53        The Act provides a plenary order of protection shall issue if the petitioner has established, among other things, he or she has been abused by a family or household member.

750 ILCS 5/214(a), 219 (West 2024). The standard of proof required in all order-of-protection proceedings is proof by a preponderance of the evidence. *Id.* § 205(a). "Proof by a preponderance of the evidence means that the facts at issue are rendered more likely than not." *Graham v. Van Rengen*, 2024 IL App (2d) 230611, ¶ 53. On appeal, this court will reverse a trial court's decision regarding issuance of an order of protection only if it is against the manifest weight of the evidence. *Best v. Best*, 223 Ill. 2d 342, 348-49 (2006). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Id.* at 350.

¶ 54       Under the Act, abuse is defined as "physical abuse, harassment, intimidation of a dependent, interference with personal liberty or willful deprivation but does not include reasonable direction of a minor child by a parent or person *in loco parentis*." 750 ILCS 60/103(1) (West 2024). Harassment is defined as "knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner." *Id.* § 103(7). Certain types of conduct are presumed to cause emotional distress unless rebutted by a preponderance of the evidence: creating a disturbance at the petitioner's place of employment or school, repeatedly calling the petitioner's place of employment or home, following the petitioner in public repeatedly, repeated surveillance of the petitioner, improperly concealing a minor from the petitioner or threatening to do so, or threatening physical force, confinement, or restraint. *Id.* § 6103(7). Physical abuse includes the knowing or reckless use of force, confinement, or conduct which creates an immediate risk of physical harm or knowing, repeated, and unnecessary sleep deprivation. *Id.* § 103(14).

¶ 55　　　　In this case, we cannot conclude that the trial court's decision to deny the plenary order of protection was against the manifest weight of the evidence. It is clear from the record that Stacey has struggled with mental health issues, which apparently escalated in February 2024, coinciding with the conflict in their marriage and, thereafter, the initiation of the divorce proceedings. It is notable that Stacey was six months postpartum at the time, and Dr. Safvi acknowledged that could have been a trigger for Stacey's symptoms of emotional instability. Stacey returned home from a two-week stay in Trinity Rock Island Hospital on March 5, 2024, on her own. Matthew testified he visited Stacey only during the initial days of her hospitalization and did not know she was coming home. The record reveals there was immediate tension when she did come home that afternoon and Matthew's parents were in the home as well. Everyone went to bed, with Stacey sleeping on the couch in the home while others retreated to their respective bedrooms. Early the next morning, Stacey and Matthew argued in the kitchen. There were no other witnesses to this altercation, although Matthew's mother testified she heard Stacey yelling for Matthew to "let her alone" and "get out of her house." Matthew testified Stacey was making a lot of noise cleaning and throwing things in the garbage. He said Stacey punched him in the chest, but Stacey denied doing so. Stacey acknowledged swiping a dishrag with Dawn soap on it across Matthew's face. She testified she was "sorry about it" and "definitely would never do that again." Although both parties acknowledged they argued in the presence of the children earlier that day, no evidence was presented to establish Stacey abused or harassed them.

¶ 56　　　　Matthew testified he was worried about himself and the children because of Stacey's mental state and he did not know when she would have an episode. Dr. Safvi testified he treated Stacey right after the March 6, 2024, incident and did not observe any symptoms consistent with psychosis or paranoia while Stacey was under his care. He diagnosed her with

"adjustment disorder with mixed disturbance of conduct and emotions." He explained in such instances, the person's emotional instability is triggered by trauma or some sort of incident. He acknowledged it was possible for a patient to be cognizant of the environmental factors and take steps to mitigate or control them to avoid the symptoms. Although Stacey refused his recommendation that she take medication to help her symptoms, he also acknowledged her symptoms improved without medication while under his care. Further, Gail and Lisa, who supervised Stacey's visitation with the children for over a year, described her as an attentive mother who has a loving relationship with the children. Lisa stated Stacey had done "very hard things" to improve her life, including counseling, seeking medical help, becoming part of a church family, and working two different jobs.

¶ 57     "Under the manifest weight standard, we give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and witnesses." *Best*, 223 Ill. 2d at 350. Stacey represented herself throughout these proceedings, and the judge had the opportunity at length to observe her demeanor and manner. In determining the plenary order of protection was not warranted, the court noted this was "not an order of protection case" and that Matthew was making it a custody case, which had gone on for a year and a half. Based upon the record before us, we agree, and we affirm the trial court's decision to deny the plenary order of protection.

¶ 58                    B. *Sua Sponte* Appointment of Standby Guardianship

¶ 59     Although not addressed by the parties, we note that the trial court decided, *sua sponte*, to open a guardianship case and appoint Matthew as the standby guardian of K.R. and J.R. We will not address the propriety of this action, especially because we take judicial notice that the guardianship case was dismissed by agreement on December 19, 2025 (case No.

-25-

25-GR-75). See Ill. R. Evid. 201 (eff. Jan. 1, 2011). If, however, the subject of a limited guardianship were to arise again in this case, we trust that the trial court would approach the matter with recognition of the appropriate principles.

¶ 60        First, a standby guardianship begins with a parent's designation of someone to fill that role, with the trial court's role being to decide whether to honor that designation by appointing the person so nominated. See 755 ILCS 5/11-5.3 (West 2024).

¶ 61        Second, whether the issue is the appointment of a standby guardian or simply a minor guardian, the trial court must address particular jurisdictional hurdles relating to the status of the minor's parents. See *id.* § 11-5.3(c) (providing that the "court lacks jurisdiction to proceed" to appoint a standby guardian where the child has a known living parent who is not unfit and who has not consented); *id.* § 11-5(b) (providing similarly for the appointment of a guardian of a minor).

¶ 62        Third, and most importantly, "[o]ne of the fundamental rights protected under the fourteenth amendment [(U.S. Const., amend. XIV)] is the right of parents to make decisions concerning the care, custody, and control of their children without unwarranted state intrusion." *Wickham v. Byrne*, 199 Ill. 2d 309, 316 (2002). "State interference with fundamental parental childrearing rights is justified in limited instances to protect the health, safety, and welfare of children." *Id.* at 317. Even in such circumstances, parents are entitled to due process of law.

¶ 63                                III. CONCLUSION

¶ 64        For the reasons stated, we affirm the trial court's judgment.

¶ 65        Affirmed.